## Board of Registration Com'rs et al. v. Campbell.
## Campbell v. Board of Registration Com'rs et al.

(Decided Oct. 27, 1933.)

(As Modified on Denial of Rehearing Dec. 12, 1933.)

598

EUGENE R. ATTKISSON for Campbell, Jr.

ROWAN HARDIN for Board of Registration Commissioners.

SHACKELFORD MILLER, Jr., for himself as Chairman, and for Owsley Brown, member of the Democratic City and County Executive Committee.

FRANK M. DRAKE for Harris Coleman.

OPINION OF THE COURT BY JUDGE RICHARDSON—Affirming in part and reversing in part.

Barney J. Campbell, Jr., as the Democratic candidate for alderman, Twelfth ward, and as a resident, citizen, taxpayer, voter, and qualified elector, of Louisville, Jefferson county, brought this action in the Jefferson circuit court against the board of registration commissioners of the city of Louisville, the Democratic and Republican county executive committees, and the individual members thereof, to have declared his legal rights, as they were affected by the interpretation and execution of the Model Registration Act for Cities of the First Class (Acts 1930, c. 48), by the registration board of commissioners, appointed and acting thereunder.

In his petition Campbell charged that the questions involved were of common and general interest to all the residents and legal voters and Democratic candidates of the city, and that it was impractical to bring all of them before the court within a reasonable time. He sought permission to sue for himself and all other legal voters, and Democratic candidates of the city, under section 25 of the Civil Code of Practice.

The defendants by special demurrer questioned Campbell's right to sue on the ground that the subject-matter was not of that character of common and general interest entitling him to sue for himself and other

voters; also, that the Democratic and Republican committees, or the members thereof, were not necessary or proper parties. The trial court sustained it on both grounds. In this we concur.

It is urgently insisted that the petition presents merely "political rights," that they are not justiciable, and therefore Campbell has no right as a citizen, taxpayer, and voter, nor as an accredited candidate of his party, to relief by the processes of the courts. The trial court overruled the special demurrer to this extent. A general demurrer was sustained to the petition; Campbell declined to plead further and his petition was dismissed.

In Stiglitz v. Schardien, 239 Ky. 799, 40 S. W. (2d) 315, 317, it was written:

"If an act of the Legislature infringes the constitutional rights of a citizen, taxpayer, and voter, he may invoke the processes of the courts to prevent the performance of a duty attempted to be imposed by such void act. Hager v. Robinson, 154 Ky. 489, 157 S. W. 1138; Schardein v. Harrison, 230 Ky. 1, 18 S. W. (2d) 316; Ragland v. Anderson, 125 Ky. 141, 100 S. W. 865, 30 Ky. Law Rep. 1199, 128 Am. St. Rep. 242; Yates, Clerk, v. Collins, 118 Ky. 682, 82 S. W. 282, 973, 26 Ky. Law Rep. 558, 930."

A fortiori, if a board, or commission or other administrative agent of the state, in the interpretation and administration of an act of the Legislature, denies or transgresses upon constitutional or statutory rights of a citizen, taxpayer, and voter, he may invoke the processes of the courts to avert such a deprivation of his rights. The circuit court, under section 126 of the state Constitution and section 474, Civil Code of Practice, has superintending control over such board, commission, or other state agency in its interpretation and administration of an act of the Legislature. Roberts v. City of Louisville, 92 Ky. 95, 17 S. W. 216, 13 Ky. Law Rep. 406, 13 L. R. A. 844; Board of Park Commissioners v. Speed, 215 Ky. 319, 285 S. W. 212; Poston v. Daily, 210 Ky. 649, 276 S. W. 554; Joseph Moore et al. v. Jas. H. Bay et al., 149 Md. 286, 131 A. 459; State v. Woodbury, 321 Mo. 275, 10 S. W. (2d) 524; Walker v. Grice, 162 S. C. 29, 159 S. E. 914.

It is agreed that the following questions are presented in Campbell's petition:

"A. Whether or not the failure of a challenged voter to appear personally at the hearing of the challenge is conclusive evidence that he is no longer entitled to registration.

"B. Whether or not the board, in passing upon a challenge, may admit the reports of investigators as evidence.

"C. Whether or not the 'protest' filed by a voter against the proposed cancellation of his registration must be in writing, or sworn to, or both.

"D. Whether or not notice of the hearing of an appeal from the action of the board must be given to party committees.

"E. Whether or not the use of the suspended file [hereafter described] is permissible."

To dispose of them properly, we are required to review certain sections of the Model Registration Act (Sections 1486b-28 to 1486b-61, inclusive, Baldwin's 1933 Supplement Ky. Statutes [Acts 1930, c. 48]).

Section 4 creates a board of registration commissioners of a city of the first class. The second literary clause of section 4 confers on the board the right to adopt such reasonable rules and regulations as may be necessary for the proper conduct of its office and the discharge of the duties imposed on it by the act.

Section 5 expressly requires that the board shall consist of the mayor and two members to be appointed by him from the two dominant political parties. It is provided in section 5 that if the members of the board cannot agree on any question in connection with the administration of the duties imposed upon it, then the mayor shall cast the deciding vote. Section 8 authorizes the board to employ and appoint such clerks and employees from time to time, and for such periods of time, as, in its opinion may be necessary for the proper conduct of its business, from a list of names furnished by the county executive committees of the dominant political parties. Section 9 confers on any member of the board, the registrar, assistant registrar, and each employee of the board, temporary or permanent, authority

to administer an oath to any person of whom information is sought touching any matter pertaining to the administration of the act. A clause in section 15 reads:

> "The registration officers shall register every person who shall apply to be registered, provided such applicant furnishes the information required to be given [in accordance with the Act] and makes oath on the form prescribed by the Board that he possesses the legal qualifications for registration."

Section 3 fixes the qualifications of the applicants for registration. A paragraph in section 15 directs who shall be entered by the registrar or deputy registrar or the inspector on the registration record in the place provided for that purpose, in the name of the person applying therefor, in which shall be stated the description of the voter as therein set out.

In section 17 it is provided that, "no person shall have the right to register during the period of 65 days in every year commencing 59 days next preceding any election held in November of any year." Section 21 authorizes a voter to apply at any time to the board in person, or by letter signed by him, to have his registration, or party affiliation, changed, and outlines the duty of the board relative thereto. Section 23 requires the preservation for a period of not less than five years of the original of all cancelled registration records in a separate file, and when any registration record is cancelled by the board, it shall be marked in large letters in ink, "cancelled," on which shall be noted in ink, the date of and the reason for such cancellation. Section 24 outlines the method to be used by the board to purge the registration records and requires the board to keep them up to date. Subsection (c) of section 24 provides that when any elector moves out of the precinct in which he is registered, or to which his registration record has been transferred by the board, to a different precinct in the city, it shall be his duty to make and sign an application to have his registration record changed and transferred to the proper precinct and to deliver the same to the office of the board in person, by mail or otherwise. Subsection (c) also confers on the board authority on the application of any elector, or upon the basis of information furnished by the agencies therein named, or by individual persons, to transfer the regis-

tration record of any elector to the precinct where the same belongs, and in doing so it is required thereby to follow the method therein prescribed. Subsection (d) of section 24 imposes the duty on the board to cause to be made a house to house canvass in each precinct of the city, each year, for the purpose of checking the registration records, and it specifically directs how it shall be made and prescribes definitely the duties of the investigators in each precinct, appointed by the board as therein directed for that purpose. Subsection (d) also states that a canvass shall be made by the inspectors of each precinct during the first two weeks of the period of fifty-nine days next preceding the general election held each year; that the board shall prepare and furnish each investigator with a list of names and addresses of the registered voters in the precinct in which he is to investigate, arranged in convenient order to facilitate the investigation. The investigators appointed for each precinct shall make written reports to the board, giving the names and addresses of all persons registered in the precinct who are not legally entitled to vote at the election to be held in that year. Where the reports of the investigators in any precinct agree that any person registered in the precinct is not legally entitled to vote at the election to be held in that year, the board shall make such changes, transfers, and cancellations in the registration records in its possession as may be necessary to make the same correspond with reports made by the investigators and correct the same up to date; provided no change shall be made until notice is served on the voter involved, and the proceedings shall be taken as directed by the remainder of this section. Subsection (e) of section 24 accords to any citizen, or either county executive committee of the two dominant political parties, the right to challenge the registration record of any voter. It also requires the challenge to be in writing, to state specifically what it charges as grounds of challenge; signed by the challenger; and filed at the office of the board, not later than five weeks next prior to the election. This subsection imposes upon the board the duty to conduct a hearing thereon, at such time as it may fix after notice fixing the time of the hearing has been served by its employee on the challenged voter and the return thereon has been signed by the person serving it in the man-

ner stated in this subsection. This subsection contains this language:

"The Board shall investigate each case before a hearing is held. The failure of any elector against whom a notice of challenge has been served as provided herein to appear shall be prima facie evidence that he is not entitled to registration, and his registration record shall be canceled."

Section 25 authorizes any person aggrieved by any act of the board in respect to his registration, or any person or executive committee that has challenged the registration of any voter, if aggrieved by any act of the board in respect to the registration of any such person, either may apply to any judge of a circuit court of the county in which the city is located, with a written statement on the printed form to be furnished by the board, for a hearing. This section further requires the judge to fix the time and summarily decide the questions thereby raised, and that his action shall be final, and the record of the board shall be made in accordance with his order. Section 32 declares "this Act and each of its various sections, paragraphs, clauses, and sections, shall be liberally construed in favor of the purposes of this Act."

The board argues that the intendment and purpose of section 32 are to liberalize and enlarge its powers. It was not the intention of the Legislature by its inclusion of section 32 to authorize the board to disregard any other clause, paragraph, or section. Commonwealth v. Bates, 235 Ky. 763, 32 S. W. (2d) 334.

Every clause, paragraph, and section of it must be given that interpretation and so administered by the board as will not only promote the orderly functions of the board, but as will carry out the purpose of the act. Board of Trustees, etc., v. Kercheval, 242 Ky. 1, 45 S. W. (2d) 846; Rouse v. Johnson, 234 Ky. 473, 28 S. W. (2d) 745, 70 A. L. R. 1077. There is nothing in section 32 indicating that the act should not be given the ordinary interpretation authorized by the whole of it, giving effect to every part thereof. Kroger Grocery & Baking Co. v. City of Cynthiana, 240 Ky. 701, 42 S. W. (2d) 904; Earhart v. Middendorf, 234 Ky. 79, 27 S. W. (2d) 657.

In the large cities wherein the voters are not personally known to one another, and to the election officers, it is an easy matter for the briber and corruptionist by the panhandling of nonresidents, repeaters, ex-convicts, and others not possessing the requisite qualifications of a qualified elector to control the result of an election. To avert such conditions the registration law is absolutely required to safeguard the rights of qualified electors, not only in their right to register or to have their registration records transferred from one precinct to another, but to prevent illegal voters participating in the election and thereby nullifying the ballots of the qualified electors. The pre-eminent, dominant purpose of the Legislature in enacting the Model Registration Act was to provide a perfect system preventing fraudulent registration of illegal voters, the fraudulent manipulation of the transferring of their registration records from one precinct to another, and their use in fraudulently voting illegal voters.

Where a registration law exists, the initial step of fraudulently voting of illegal voters is the act of registration. The second needed one is the keeping ready for use on the day of the election, this registration record. To effectuate the purpose of the registration law, it is not only essential, but imperative, that its every positive direction be scrupulously observed and reasonably administered. Its mandatory provisions should not be construed and applied as directory.

"Of course our prime duty is to give effect to the legislative intent as expressed in the statute, and to that end there are many considerations to guide us. For instance, the object which the Legislature sought to attain by a statute, and the evil which it sought to remedy, may always be considered to ascertain its intent and purpose [Straughan v. Meyers, 268 Mo. 580, 187 S. W. 1159; Ross v. Ry. Co., 111 Mo. 18, 19 S. W. 541]; the court may consider the expediency of the law in ascertaining the legislative intent [State ex rel. v. Regan, 317 Mo. 1216, 298 S. W. 747, 55 A. L. R. 773]; remedial statutes are not in all events to be taken literally, but are to be interpreted so as to give effect to the legislative purpose, and to such purpose is to be ascribed a reasonable and not a technical meaning [Cole v. Skrainka, 105 Mo. 303, 16 S. W. 491]; it is to be borne in mind that laws are presumptively passed with a view to the

welfare of the whole community [Gist v. Constr. Co., 224 Mo. 369, 123 S. W. 921]; and in determining the legislative intent, and in effectuating the legislative purpose, words used may be either expanded or limited in the meaning so as to harmonize the law with reason [City of St. Louis v. Christian Brothers College, 257 Mo. 541, 165 S. W. 1057; Kerens v. St. Louis Union Tr. Co., 283 Mo. 601, 223 S. W. 645, 11 A. L. R. 288]; and, in determining whether a statute is directory or mandatory, the prime object is to ascertain the legislative intention disclosed by the statutory terms and provisions in relation to the object of the legislation. Provisions relating to the essence of the thing to be done, that is, matters of substance, are mandatory, while, generally, statutory provisions not relating to the essence of the thing to be done and as to which compliance is not a matter of substance are directory. State ex rel. v. Brown, 326 Mo. 627, 33 S. W. [2d] 104, 107.'' Warrington v. Bobb (Mo. App. 56 S. W. (2d) 835, 837.

There is no difference in law between registration and election. Registration is the method of proof by a public record for ascertaining and identifying the electors residing in each precinct who are qualified to cast votes in the election of each year. It is a part of the machinery of elections. People ex rel. Stapleton v. Bell et al., 119 N. Y. 175, 23 N. E. 533; O'Brien v. City of Saratoga Springs, 131 Misc. 728, 228 N. Y. S. 82, 83.

The conduct and control of the registration of voters are governmental functions, and the officers upon whom the law imposes the duty of making and preserving the same are representatives, and under the authority, of the state. They are agents of the state, and not of the political party designating them, or of the city authorities appointing them or of the applicant for registration. O'Brien v. City of Saratoga Springs, supra; People v. Carson, 155 N. Y. 491, 50 N. E. 292.

When ascertaining the qualifications, the identity, and determining the right, of the elector to register, in permitting him to register, or to change the registration record from one precinct to another to which he belongs, and when preventing an illegal voter registering or changing his registration record, the duties of the board in relation thereto are mandatory, and cannot be

delegated to others. Hallanan v. Hager, 102 W. Va. 689, 136 S. E. 263.

With these general principles in mind, we shall now consider the five questions stated above, first considering C and D.

C embraces the question whether a protest filed by the voter against the proposed cancellation of his registration must be in writing, or sworn to, or both. The fact that the act provides that in the event of a protest, it must be filed, clearly shows that by its use of the word "filed" the Legislature intended that such protest must be in writing.

The above-quoted portion of section 9 provides that the board shall have the authority to administer an oath to any person of whom information is sought, touching any matter pertaining to the administration of the act. This provision makes it plain that if the board accepts the protest as information touching the matter under investigation, while not mandatory, it in its discretion may require the protestant to swear to his protest.

Section 25 confers the right of appeal on an elector aggrieved at any act of the board in respect to his own registration; also on any person or executive committee that has challenged the registration of any voter when aggrieved by the act of the board in respect to the registration of such person. It is elementary that the right of an appeal is purely statutory. The act limits the right of appeal to the challenged voter and the challenger. Therefore no other may exercise it. Notice of an appeal need be given only to the board of registration commissioners.

Question E involves the right of the board to use a "suspended file." The act contemplates an initial registration and the subsequent transfer of the registration record of an elector, in the event he removes from one precinct to another in the city, after his initial registration.

It only authorizes a qualified elector domiciled in the city to register, or to have his registration record changed from one precinct to another, and confers on the board only the power to register, or to change the

registration record of, a qualified elector domiciled in the city.

The term "domicile" or "residence" of a voter is not defined by the Model Registration Law, but is defined by section 1478, Ky. Statutes. Erwin v. Benton, 120 Ky. 536, 87 S. W. 291, 27 Ky. Law Rep. 909, 9 Ann. Cas. 264. Section 1478 is consistent with the provisions of the Model Registration Act, and should be followed by the board when determining whether the voter is domiciled within the city, within the purview of the Model Registration Law.

Section 1480, Ky. Statutes, prescribes the standard by which the residence of a voter may be determined. This section is also consistent with the Model Registration Law, and should guide the board when determining the residence of the applicant for registration or the transfer of his registration record from one precinct to another.

The act is silent as to the directions to, and the duties of, the board in the handling or keeping the application for the transfer of the registration record of the elector to the precinct where he belongs after his removal from the precinct in which he resides at the time of the initial registration, or at the time of the previous change of his registration record to another. Between that time, and the date of the act of the board, actually making the transfer of the registration record of the elector, in the absence of express language of the act, directing the board what it shall do with, and where it shall keep, the voter's registration record, is necessarily in the discretion of the board. It is manifest that it was the intention of the Legislature that the board during this interim should withdraw from its record containing the registration records of the voters, the registration record involved, and take such care of it by a system or method that will make it absolutely assured that, before the completion by the board of the transfer of the voter's registration record, it cannot by oversight or mistake of its employees, or the board itself, or by stealth or otherwise, be used by the voter, or another, on the day of the election, for the purpose of voting at any election during the period of delay necessarily incident to the completion of the transfer of such registration record.

The board in such cases has adopted and used a "suspended file" in which is kept the registration records of the voters who have moved from the precincts in which they are registered to another in the city, until the transfer is completed. The adoption and use by the board of the "suspended file" for the registration records of such voters are within the discretion of the board, and not inconsistent with any clause, paragraph, or section of the Model Registration Act.

Questions A and B must be determined by the last literary clause of subsection (e) of section 24. It will be noted that the first sentence of this clause, reads:

"The Board shall investigate each case before a hearing is held."

The next following sentence is:

"The failure of any elector against whom a notice of challenge has been served as provided herein to appear shall be prima facie evidence that he is not entitled to registration, and his registration record shall be canceled. Appeals from the actions of the Board may be taken in the manner hereinafter provided."

The first literary clause of section (e) declares who shall have the right to challenge the registration record of a voter, and directs that the challenge shall be in writing; what it shall contain, how it shall be served on the voter, and that the board shall conduct a hearing thereon at such times as it may fix, after notice has been served by an employee of it, upon the challenged voter as therein directed.

The sentence, "The Board shall investigate each case before a hearing is held [on each challenge]," must be read and considered in connection with, and in the light of, other sections, authorizing and directing other investigations thereunder. It is the imperative duty of the board under the language, "The Board shall investigate each case before a hearing is held," to make an independent investigation of each case of a challenged voter between the date of the service of the notice on him, and the date of the hearing thereon, and since no method of investigation by the board is set out by this provision of the act, other sections thereof must be looked to for the method of investigation thereunder.

The investigation mandatorily required by subsection (e) should be made by the board by and through its investigators, designated in section 24, in the same manner and way and as required by subsection (d).

The fact that the Legislature did not follow the language, "The Board shall investigate each case before a hearing is held," with specific directions therein as to how, and by whom, the investigation thereunder should be made, does not indicate its intention to confer on the board authority to make an investigation under the quoted clause of section 24 (e) on its own accord, and in accordance with a method adopted by it, or other than that provided in subsection (d). It is without authority to inaugurate a method of investigation after the challenge is filed and before the hearing thereon, other than or different from that authorized by subsection (d).

After the challenge is filed and before the hearing is held thereon, and the board makes an investigation under the quoted sentence of subsection (e), it should require its investigators appointed sufficient in number, in its discretion, and assign them to any one or more precincts as it deems proper or necessary, to make written reports to it of their investigation, within a reasonable time next before the time fixed by it for the hearing of the challenge filed by the challenger against the registration record of the elector.

If the written reports of the investigators showing their investigation of the grounds of challenge agree on the relevant facts and such facts show to the satisfaction of the board that the challenged voter is a duly qualified elector, within the meaning of the act, and registered in accordance with its provisions, the board should regard the voter as having been challenged without cause. Of course, from its action the challenger may apply to the circuit judge as provided in section 25 of the act.

Or if the written reports of the investigators agree on the relevant facts, and such facts to the satisfaction of the board show that the challenged voter is a qualified, registered elector, but has moved from the precinct in which he was domiciled at the time of his initial registration, or at the time of the last transfer of

his registration record, to another precinct in the city, the board should also regard the challenge of the voter's registration record as having been made without cause, and it should proceed to transfer the registration record of the challenged elector to the precinct where he belongs, following, in doing so, the provisions of subsection (c) of section 24, at the same time placing and keeping his registration record with the "suspended list," to remain there, during the process of its making the transfer. An appeal may also be taken by the challenger or challenged, from its action as provided in section 25 of the act.

If, however, the investigators in case of a challenged voter do not agree in their written reports on the relevant facts concerning the grounds of challenge, charged against the elector by the challenger, or if their written reports agree on such facts and if the board on such facts cannot determine that the challenged elector is qualified within the meaning of the act, registered in accordance therewith and residing in the precinct shown by his registration record, and in either case the challenged voter fails to appear at the office of the board at the time theretofore fixed by the board for the hearing of the challenge filed against his registration record, then it is the imperative duty of the board immediately to cancel his registration record, and mark it canceled with ink, stating on it with ink the date and reason of cancellation.

The board is without discretion as to the cancellation of his or her registration record, but must forthwith cancel it. In either case the challenged voter may apply to a judge of the circuit court as provided in section 25 of the act.

It is in the discretion of the board to require the inspectors to verify by oath their respective written report to it. However, a requirement of the board that the inspectors' reports be sworn to by them is calculated to make assured accuracy and verity of their reports and at the same time thereby render them subject to the penalties of the statutes against false swearing, the consciousness of which oftentimes serves as a deterrent, preventing a dereliction in the performance of official duties.

The quoted clause of section 4 confers upon the

board the right to adopt such reasonable rules and regulations as it may in its discretion deem necessary for the proper conduct of its office and the more efficient discharge of the duties imposed by the act upon it or its employees; but this section does not authorize it to adopt a rule or regulation inconsistent with any clause, paragraph or section of the act, although it might add to the convenience or save trouble and work for it or its employees. Dorman v. Wheeler, 244 Ky. 628, 51 S. W. (2d) 941.

In Dorman v. Wheeler, the defendant was summoned more than ten days before the commencement of the regular term of the circuit court. He failed to answer. The circuit court had adopted a rule not to allow a default judgment to be entered in any case, although defendant was summoned more than ten days before court and failed to answer, until notice was served on him that the plaintiff would enter a motion for a default judgment. Section 980, Ky. Statutes, authorizes the circuit court to adopt rules and regulations relative to its work. The regular judge of the court adopted the rule we have stated. This court held that although the judge of the court was authorized by section 980 to adopt rules and regulations appertaining to the conduct of his court, the statute conferred no authority on him to adopt a rule inconsistent, or in conflict, with either the statutes or the Civil Code. This rule and the reason for it apply to the board of registration commissioners in the exercise of its authority to adopt reasonable rules and regulations under section 4.

When hearing the case of a challenged elector's registration record, and determining the questions presented, the duties of the board are quasi judicial, notwithstanding it is the clear intent and purpose of the act that the procedure of the board in hearing the contentions of the challenger and the challenged elector should be informal, summary, and expeditious. But it should be sufficiently formal and conducted with such leisure as will afford a reasonable time and opportunity for the challenged voter and the challenger to present to the board the relevant facts to enable it to dispose of the case intelligently and fairly. From the final determination of each case by the board, an appeal may be prosecuted under section 25, by either the challenger

614

or the challenged, if he feels himself aggrieved because of the board's action.

This action was filed in equity. It is argued that no equitable issues are presented. Even so, this is no ground for sustaining a demurrer to the petition or abating or dismissing it. Section 8, Civil Code of Practice.

Wherefore the judgment is affirmed as to the board of registration commissioners and reversed as to Campbell, for proceedings consistent with this opinion.

Whole court sitting.